Argued May 5, modified and remanded June 24, 1959

YORK ET UX *v.* STALLINGS ET AL

341 P. 2d 529

*W. P. Riddlesbarger,* Eugene, argued the cause and filed briefs for appellants.

*John F. Kilkenny,* Pendleton, argued the cause for respondents. On the brief were Kilkenny & Fabre and John H. Kottkamp, Pendleton.

Before ROSSMAN, Presiding Justice, LUSK, MCALLISTER and SLOAN, Justices.

McALLISTER, C.J.

This is a suit in equity brought by Grant York and Iva York, his wife, to enjoin defendants, who operate a sawmill, from interfering with the use and enjoyment

of plaintiffs' premises and to recover damages. From a decree in favor of plaintiffs, the defendants have appealed.

Plaintiffs are the owners of a 320 acre farm situated about one and a half miles west of Milton-Freewater which they acquired in 1947. During that same year plaintiffs built a modern home on the property at a cost of about $25,000. The house was located just south of an unpaved country road which runs along the north side of plaintiffs' farm. The farm has been used to raise cattle, wheat, peas, alfalfa and some fruit.

In 1955 the defendants acquired the property across the road from plaintiffs' home and commenced construction of their mill. The mill included a modern electric sawmill, planing mill, chipper, dry kiln, log pond, refuse burner, and other facilities usually incident to such a plant. Construction of the mill began in March 1955 and operation of the mill commenced in September of the same year. The entire mill cost more than $680,000 and when in production employs approximately 80 persons with a monthly payroll of $50,000.

A railroad runs along the north side of defendant's property and the mill is served by a spur track that had been built to serve an apple packing warehouse formerly situated on the property. The warehouse had not been used for many years and had been torn down about 15 years before defendants acquired the property. When purchased by defendants the property was planted partly in alfalfa and partly in grapes. The area surrounding the mill was devoted to agricultural and residential uses, there being some 20 residences within a quarter mile radius. Since the re-

moval of the old warehouse some years earlier, no commercial activity had been carried on in the area.

Plaintiffs complain that from the time it began to operate defendants' sawmill caused great quantities of smoke, sawdust, cinders, ashes and other particulates to be deposited on plaintiffs' premises and that the operation of the conveyor at night caused excessive noise. Plaintiffs also complain that the mill pond gave off an offensive odor which continuously drifted over plaintiffs' premises. Plaintiffs prayed for both general and punitive damages and for an injunction.

The trial judge did not make findings of fact but we have the benefit of a memorandum opinion prepared by him. He concluded that from the time the mill began to operate, partially burned sawdust and wood particles "in no trivial amount" had been deposited in and about plaintiffs' home and that "it was an unusual day when at some time it did not occur if the mill was running." The judge was not convinced that the mill pond had caused any odor sufficient to cause substantial annoyance to plaintiffs. He was convinced that the chain of the conveyor carrying waste to the burner frequently operated at night and caused excessive noise sufficient to disturb plaintiffs' sleep to an unreasonable degree.

The court entered a decree enjoining defendants from burning the waste products of their sawmill except at a place which would prevent sawdust, cinders, ashes and other particulates from being deposited in and around the plaintiffs' premises and from operating the waste conveyor of the mill at night unless the noise from said conveyer could be effectively eliminated and awarded plaintiffs damages in the sum of $1,000. The defendants contend that this decree was

erroneous and particularly object to the provisions thereof enjoining the burning of waste in the burner at the mill.

We have examined carefully the transcript of about 750 pages containing the testimony of nearly 30 witnesses. It would serve no purpose to review that testimony in detail in this opinion and we will merely set forth the conclusions which we have reached after a full consideration of all the evidence.

As to the complaint of excessive noise, we are satisfied that in the beginning the conveyor created a good deal of noise and when operated at night disturbed plaintiffs' sleep and caused them considerable annoyance. Remedial action was taken by defendants to reduce that noise and further improvements were about to be made at the time of the trial. These consisted primarily of lining and insulating the metal conveyor with hardwood. We do not know how effective these improvements may have been.

The witnesses who testified concerning the fallout of sawdust and cinders may be divided into several general groups. The first group includes the plaintiffs, their daughter and son-in-law and a number of friends and acquaintances of the Yorks. The testimony of this group tends to prove that the fallout of sawdust and cinders about the York home occurred so frequently and in such amounts as to substantially and unreasonably interfere with plaintiffs' enjoyment of their home. In support of their claim, the plaintiffs introduced into evidence the contents of a number of jars containing samples of fallout collected by Mrs. York at various times between May 15 and October 17, 1956, 17 samples in all. The irregularity of the sampling, the mixture of dust and grass particles

therein, and the marked coincidence of the time of sampling and the deviation of the wind from its prevailing south to north direction, all detract from the cogency of this evidence.

The second group of witnesses consists of those who live on the north side of the burner. These witnesses testified that there was little or no fallout about their homes. Most of these witnesses live further from the mill than the Yorks but their homes were mostly on the leeward side of the mill. Generally, these people exhibited a friendly attitude toward the mill and some of them testified that it was a welcome addition to the community. The area had suffered a severe freeze which had wiped out most orchards in the community and the mill served to provide additional employment at a time of need. The testimony of these witnesses in many respects directly contradicts the testimony of the Yorks and their witnesses.

The third group of witnesses included the mill owners and their employees. Testimony of these people tended to prove that although there was some fallout it did not attain any significant proportions on the south side of the mill. Mr. Stallings, one of the defendants, admitted that there had been substantial fallout on the York premises when the mill started to operate. He testified that defendants had spent about $5,000 in an attempt to eliminate this fallout and contended that these improvements in the burner had reduced the fallout on the south side of the burner to the point where it was infrequent and not substantial.

The fourth group of witnesses consists of "outside experts," burner builders and repairmen. Their testimony showed that there was substantial fallout in the vicinity of the burner on the leeward side, but only a

light fallout on the south side. This testimony revealed that the difficulty experienced with the burner's efficiency occurred mostly during the warm-up period—before the burner shell reached the full temperature necessary for efficient combustion. This warm-up period was variously estimated at from one and one half to two hours. The changes made in an effort to improve the burner reduced the fallout to some extent and at the time of trial tests were still in progress to determine the most efficient regulation of the burner drafts. Additional improvements in an effort to further reduce, if not eliminate, the fallout were contemplated, including the installation of a spray over the dome of the burner. We of course do not know whether these additional improvements have been made and to what extent, if any, they have proved effective.

Without the aid of accurate and impartial measurement of the frequency and intensity of the fallout on the York premises, it is difficult to draw final conclusions from the evidence with any sense of confidence. We have the feeling that some of the witnesses exaggerated the extent and frequency of the fallout and that others were prone to minimize the problem. Taking the testimony as a whole, it is evident that some fallout from defendants' burner fell at least intermittently on or about the York home. However, neither the amount nor the frequency of this fallout has been established by clear and convincing evidence.

■ Turning to the applicable rules of law, we first take note of the proposition that an injunction is an extraordinary remedy and will be granted only upon clear and convincing proof. *De Armond et al. v. Moon*

*et al.,* 123 Or 28, 260 P 1100; *Bennett v. City of Salem et al.,* 192 Or 531, 235 P2d 772; *Barker Painting Co. v. Brotherhood of Painters, Etc.,* 15 F2d 16; *Dolan v. De Capua,* 16 NJ 599, 109 A2d 615. See also 28 Am Jur 217, Injunctions § 24 and 43 CJS 889, Injunctions § 192.

■ It is well settled that a sawmill is not a nuisance per se. *Bourne v. Wilson-Case Lumber Co.,* 58 Or 48, 113 P 52 and *Lindley v. Hyland,* 173 Or 93, 144 P2d 295. It is clear, however, that a sawmill may become a nuisance by reason of the character of the neighborhood in which it is situated or the manner in which it is operated. See *Kramer v. Sweet,* 179 Or 324, 331, 169 P2d 892 and 66 CJS 810, 813, Nuisances § 62.

In *Amphitheaters, Inc. v. Portland Meadows,* 184 Or 336, 348, 198 P2d 847, the court quoted with approval the following rule:

"What is a reasonable use and whether a particular use is a nuisance cannot be determined by any fixed general rules, but depend upon the facts of each particular case, such as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like." 39 Am Jur 298, § 16

In the same case it was held that an intentional interference with the use and enjoyment of land is not actionable unless that interference is both substantial and unreasonable, citing Restatement of the Law of Torts, Vol 4, § 822, Comment g and § 826, Comment a. The court also said:

"Again it is held that whether a particular annoyance or inconvenience is sufficient to constitute a nuisance depends upon its effect upon an ordinarily reasonable man, that is, a normal

person of ordinary habits and sensibilities, Stoddard v. Snodgrass, 117 Or. 262, 241 P. 73; 39 Am. Jur., Nuisances, § 31, citing many cases; Kellogg v. Mertens, (La. App.), 30 So. (2d) 777; Kimball v. Thompson, 70 F. Supp. 803; Columbian Carbon Co. v. Tholen, (Tex. Civ. App.), 199 S. W. 825; Metropoulos v. MacPherson, 241 Mass. 491, 135 N. E. 693; Price v. Grantz, 118 Pa. St. 402, 4 Am. St. Rep. 601; Walker v. Wearb, 6 N. Y. S. (2d) 548; Kentucky & West Virginia Power Co. v. Anderson, 288 Ky. 501, 156 S. W. (2d) 857. The doctrine upheld in the above cited cases appears to have had its original in Aldred's Case, (1601) 9 Coke 57b, 77 Eng. Reprint 816. The rule announced in that case, " 'Lex non favet delicatorum votis' ", was quoted with approval by this court in Kramer v. Sweet, supra. This doctrine has been applied in many cases involving smoke, dust, noxious ordors, vibration and the like, in which the injury was not to the land itself but to the personal comfort of dwellers on the land."

■ One factor commonly considered in determining the existence of a nuisance is the character of the area in queston. Thus, in a purely residential area very strict rules are enforced and only slight interference with residential rights is tolerated. The community involved here was a semi-rural residential area with some 20 houses within a quarter mile radius. This area was distinguished, however, from other semi-rural residential areas by the presence of the railroad. Although this railroad is a branch line over which few trains are operated, its presence foreshadowed future commercial development along its course. There is a grain elevator about one half mile west of the mill which serves as a shipping point for wheat. The spur track which had served the former apple packing warehouse was one of the factors which caused the de-

fendants to purchase this property for a mill site. Plaintiffs built their home within about 500 feet of the railroad track.

■■ Another factor that deserves consideration is the nature of the industry. A cotton gin was afforded an extra measure of protection in *Oliver v. Forney Cotton & Oil Ginning Co.,* (Tex Civ App) 226 SW 1094, because of the vital role cotton plays in the economy of Texas. Timber and logging is our primary industry and its operations are not to be enjoined without substantial reasons.

■ Still another factor is priority of occupation. The York home had been built years before the mill was ever constructed and thus the element of priority of occupation is with plaintiffs. This rule was recognized by this court in *Kramer v. Sweet,* supra, as follows:

"* * * The plaintiffs had established their residences in the locality for many years prior to the invasion thereof by defendant's slaughterhouse, and, under those circumstances, the court must take a less favorable view of defendant's case than it might have been disposed to take if his business had been maintained in the neighborhood for a long period of time."

■■ Although we have found that the fallout of sawdust and cinders on plaintiffs' premises and the noise at night entitled plaintiffs to some relief, it does not follow that an injunction should issue as a matter of course. The court may refuse an injunction in certain cases where the hardship caused to the defendant by the injunction would greatly outweigh the benefit resulting to the plaintiff. The injunction does not issue as a matter of absolute or unqualified right but is subject to the sound discretion of the court. Al-

though the authorities have not uniformly adopted the comparative injury doctrine, we are convinced that it represents the better rule.

Perhaps the cases that best illustrate the dilemma faced by the courts in situations of this kind are *Madison v. Ducktown Sulphur Copper & Iron Co.*, 113 Tenn 331, 83 SW 658; *Georgia v. Tennessee Copper Co.*, 206 US 230, 237 US 474, 240 US 650. The smoke and gases from the copper reducing apparatus clearly constituted a nuisance, yet the courts refused to issue the injunctions that would in effect close down the most important industry in the area. Although the case at bar is not a Ducktown case, it does indicate clearly the desirability of adopting a reasonably flexible rule.

We believe the approach offered by the Restatement of Torts is sound. The rule is stated in § 941 as follows:

"The relative hardship likely to result to the defendant if the injunction is granted and to the plaintiff if it is denied, is one of the factors to be considered in determining the appropriateness of an injunction against tort."

The following cases accept the balancing doctrine: *Mountain Copper v. United States,* 9 Cir, 142 F 625; *Bliss v. Anaconda Copper Co.,* 9 Cir, 167 F 342, affirmed sub nom *Bliss v. Washoe Copper Co.,* 9 Cir 186 F 789 cert den 231 US 764, 34 SC 327, 58 LE 471; *Madison v. Ducktown Sulphur Co.,* supra; *Smith v. Staso Milling Co.,* 2 Cir 18 F2d 736. Contra: *American Smelting & Refining Co. v. Godfrey,* 158 F 225, 8 Cir; *Sullivan v. Jones & Laughlin Steel Co.,* 208 Pa 540, 57 A 1065; *Whalen v. Union Bag & Paper Co.,* 208 NY 1, 101 NE 805. See, also 37 Yale L J 97, note 4.

This court heretofore has accepted the balancing doctrine in cases involving the public convenience. In *Fraser v. City of Portland*, 81 Or 92, 98, 158 P 514, this court stated:

"* * * sometimes a court of equity will decline to raise its restraining arm and refuse to issue an injunction * * * even though an admitted legal right has been violated, when it appears that * * * the issuance of an injunction would cause serious public inconvenience or loss without a correspondingly great advantage to the complainant."

*Booth-Kelly v. City of Eugene*, 67 Or 381, 136 P 29; *Minto v. Salem Water, Light & Power Co.*, 120 Or 202, 250 P 722. See also *City of Harrisonville v. Dickey Clay Mfg. Co.*, 289 US 334, 53 SC 602, 77 LE 1208.

Some support for the extension of this doctrine to private nuisances can be found in *Bourne v. Wilson-Case Lumber Co.*, supra, and *Stoddard v. Snodgrass*, 117 Or 262, 241 P 73.

Although we are satisfied that the fallout from defendants' burner has entitled plaintiffs to some relief, there are several reasons why we are unable to affirm the decree of the lower court or to finally dispose of all the issues at this time. We have mentioned the lack of an accurate measurement of the fallout of sawdust and cinders on the York premises. In this day of general concern over fallout of radioactive particles and air pollution in large cities, the measurement of fallout is more than a matter of casual observation. We are not inclined to shut down defendants' mill on the strength of the general and rather indefinite impressions of witnesses who made only casual observations on occasional visits to the York home. Not when the fallout can be measured with reasonable accuracy by impartial tests—tests which

if necessary can be made by direction of the trial court. See for example, Air Pollution Training Course Manual, U. S. Public Health Service.

We do not know what effect the decree of the lower court will have on the operation of the mill. In their briefs the parties make conflicting claims. Defendants contend that the expense of hauling the waste to another site for burning will force them to close the mill. Plaintiffs insist that the expense will be nominal. The record is almost silent. Without adequate evidence on this point we have no proper basis for decision.

We further believe that the provision of the decree requiring the defendant to "effectively eliminate" the noise from the conveyor should be modified. The decree should enjoin only noise which unreasonably interferes with plaintiffs' enjoyment of their property.

In view of the foregoing and taking into account all of the circumstances of this case, it is the judgment of this court that:

■ (1) the decree with regard to the abatement of noise caused by the conveyor at night should be modified to enjoin only noise which will unreasonably interfere with plaintiffs' enjoyment of their property;

■ (2) the award to the plaintiffs of $1,000 damages plus costs and disbursements is affirmed;

■ (3) the decree enjoining the defendants from burning waste products in their mill is set aside; and the case is remanded with instructions to take such further testimony as may be offered by either party with regard to (a) any improvements in the burner or its operations since the former trial; (b) whether fallout

is still occurring in and about the York home, and if so, the nature and extent thereof; (c) the feasibility of transporting the sawdust to another place for burning or disposal and whether such a program would be so burdensome as to cause a shut-down of the defendants' mill. The court shall then enter such decree as may be consistent with the principles herein announced.

Plaintiffs shall recover their costs and disbursements in this court.