**R. L. RENKEN et al., Plaintiffs,**

v.

**HARVEY ALUMINUM (INCORPO-
RATED), Defendant.**

Civ. No. 61–207.

United States District Court
D. Oregon.

Dec. 23, 1963.

James W. Morrell, Tooze, Powers, Kerr, Tooze & Morrell, Portland, Or., for plaintiff.

Sam F. Speerstra, Rhoten, Rhoten & Speerstra, Salem, Or., for defendant.

KILKENNY, District Judge.

Each of the plaintiffs, since 1958, and in many instances prior to that year, has been in continuous possession of land in Wasco County, Oregon, which land was and is used principally for agricultural and horticultural purposes, in growing and production, for home and commercial purposes, of certain fruit consisting of cherries, prunes, peaches and apricots.

Plaintiffs seek to enjoin the defendant from operating its plant in such a manner as to permit the escape therefrom of excessive quantities of the element, fluorine, which is carried by air currents to plaintiffs' lands. Defendant is a corporation, incorporated under the laws of the State of California. Since July 28, 1958, it has been and still is the operator of a certain aluminum reduction plant located near the city of The Dalles in Wasco County, Oregon. Since said date the plant has been continuously operated and, as an integral part of said operation, has emitted and still emits into the atmosphere quantities of matter chemically composed of various elements, including fluorides. The said matter in the form of particles, particulates, solids and gasses has been and is spread by currents of air and wind and, from time to time, such material has been deposited on plaintiffs' lands and fruit trees.

Defendant's plant was constructed, and is being operated, pursuant to the Defense Production Act of 1950, as amended. Its original cost, and subsequent additions, is in excess of $40,000,000.00. The plant annually produces approximately 80,000 tons of aluminum, which is used by the defendant, and others, throughout the United States for industrial and National Defense purposes. Approximately 550 persons, living in the area of The Dalles, are employed in said plant. It has a gross annual payroll of $3,500,000.00.

The plant produces primary aluminum, by the use of what is known as the vertical stud soderberg elecrolytic cells. At present 300 cells are in operation. The basic process employed at the plant is the same as that employed the world over in making aluminum, the process being precisely described by Judge East in his opinion in Fairview Farms, Inc. v.

Reynolds Metals Company, 176 F.Supp. 178 (D.C.Or.1959). The vertical stud soderberg cells employed by Harvey were not used in the Reynolds plant. The essential difference between the cells, or pots, used in the Reynolds plant is, insofar as the escape of particulates and gasses is concerned, that Reynold uses a hood, with a controlling air system, which captures most of the stray gasses, affluents and particulates which might escape into the open area around the pots. The vertical type, employed by Harvey, has an apron which collects approximately 80% of these gasses and particulates, but the remaining 20% escapes from the area where the hoods would be located, mixes with other air in the building and then drifts upward into the water spray controls in the roof. It is conceded that in the production of aluminum there is inevitably a release, from the cells, of some gasses and particulates, including fluorides.

The initial fume control apparatus at the Harvey plant consisted of a cast iron skirt surrounding the anode, which collected a portion of the fumes at the source and directed them to burners mounted at both ends of each anode. To these burners were connected fume exhaust ducts which lead the fumes to a main collector pipe carrying them to the dust collector and a fan. The fan created a suction which pulled the fumes from the cells and the burners, through the ducts. From the fans the fumes are directed to a humidifying and bubbling chamber before entering the scrubber tower. The fumes are washed in the tower by multiple layers of water sprayers placed 10 feet apart. At the top of the towers is a mist eliminator.

Tests made, from time to time, indicate that the fume control system, thus described, operated at 95% efficiency, or better, during the test periods on the portion of the fumes caught and delivered to the system. The amount of equivalent fluoride ion leaving the scrubbing towers into the atmosphere from this control apparatus is calculated at 300 pounds per day. This system treats approximately 80% of the fumes released from the cells. The remaining 20% of the fumes escape into the open building, and rise to the top where they pass into roof monitors located at the top of each of the buildings housing the cells. In the spring of 1962, a system of sprayers and screens were installed in the roof monitor and this system has been operating at full capacity since the beginning of 1963. These sprayers and screens collect a portion of the fluorides reaching the roof monitor. Since this latest installation the roof monitor sprays and screens have been between 67 and 70% effective in collecting the fluorides reaching the roof monitors. The amount of equivalent fluoride ion leaving the roof monitors into the atmosphere is calculated at 1,000 pounds per day. Overall, the combination of the original fume control system, as it has been added to and improved from time to time, and the roof monitor sprays and screens has achieved approximately 90% effectiveness with respect to collecting the fluorides released from the aluminum cells.

■ The record is undisputed that approximately 1,300 pounds of fluoride ion escape from the roof monitors and scrubbing towers into the atmosphere each day. Although the prevailing wind is southwesterly, the record clearly shows that on numerous days each month and on many hours of each day, the area is without measurable wind. At such times, a blanket of smoke from defendant's plant, covers the area, including plaintiffs' lands and orchards. This blanket was observed by the Court, not only on the day of inspection of the plant, but also on many occasions since that time. There is no doubt in my mind but that better controls can be exercised over the escape of the material in question. No sound reason has been advanced by defendant why hoods, similar to those employed by Reynolds, should not be installed. While it is true that a substantial portion of the gasses and particulates escape at the time when the new aluminum ore is being introduced into the pot or the liquid metal is removed,

I am convinced that such an escape could be prevented by a properly designed hood over the open area. I agree with the expert, that after the installation of the hood, the small amount of gasses which might escape on the introduction of ore or the removal of liquid metal would be inconsequential.

Likewise, the record convinces me of the feasability of the introduction of electrostatic precipitators for the removal of the minute or small particulates which are not removed by the other processes. The multi-cyclone dust collector now used in the plant at The Dalles is efficient in collecting the large or heavy particulates, but is of little value in removing the smaller variety. All of the experts agree that this is the field in which the electrostatic precipitators are at their best. The great weight of the evidence points to the conclusion that the installation of the cell hoods and the employment of electrostatic precipitators would greatly reduce, if not entirely eliminate, the escape of the excessive material now damaging the orchards of the plaintiffs.

While the cost of the installations of these additional controls will be a substantial sum, the fact remains that effective controls must be exercised over the escape of these noxious fumes. Such expenditures would not be so great as to substantially deprive defendant of the use of its property. While we are not dealing with the public as such, we must recognize that air pollution is one of the great problems now facing the American public. If necessary, the cost of installing adequate controls must be passed on to the ultimate consumer. The heavy cost of corrective devices is no reason why plaintiffs should stand by and suffer substantial damage.

## DAMAGES TO PLAINTIFFS

It is my considered opinion that the evidence on damage to cherries is so conflicting and controversial it would be difficult to hold that the cherry crops were severely damaged by the gasses or particulates emitted from defendant's plant. The evidence clearly shows that the year 1960, the one in which plaintiffs claim their principal cherry damage, was an exceptionally light cherry crop, not only in Wasco County, but throughout the States of Oregon and Washington. I am convinced that the light cherry crop in 1960 was due to factors other than the fluorides escaping from the plant of the defendant. However, the evidence is convincing that the deposit of this material on the trees at blossom time creates damage.

On the other hand, I find that the evidence is clear and convincing that peaches and apricots and peach and apricot trees were damaged by the escape of the fluorine and fluorides from defendant's plant, and, that each plaintiff owning a peach or apricot orchard, sustained a substantial damage from said source to his crops and trees during each year since 1958. This fact is not seriously contested by the defendant. The defendant recognized this damage and voluntarily dispatched its crews to different peach orchards in the area to ascertain the amount and settle for the damages caused to the orchard owners. Defendant agrees that it settled the damage claims of plaintiffs Ellett, Feling, Fleck, Weston Meyer, W. H. Meyers, Jr., Wachter and Polehn for loss of prune and apricot crops and damage to peaches and damage to or loss of peach, prune or apricot trees occurring as a result of the operation of the defendant's aluminum plant prior to January 1, 1962. I find that said damage to each of said landowners was substantial, although not approaching $10,000.00 as to each plaintiff, or group of plaintiffs, interested in one tract of land. On the other hand, I find that each of said plaintiffs or group of plaintiffs, owning one particular tract of land, in good faith, alleged damage in excess of $10,000.00 in the Pre-Trial Order, that there is a diversity of citizenship and that the Court has jurisdiction. Saint Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Davenport v. Mutual Benefit Health & Accident Assn., 325 F.2d 785 (9 Cir. December, 1963).

REMEDY

■■ Defendant concedes that plaintiffs repeatedly warned it of the emissions, damages to and alleged trespasses on plaintiffs' property. The evidence supports, and I find, that the emissions from defendant's plant continued to settle on plaintiffs' land and orchards to and including the time of the trial. That the continued settling of the fluorides from defendant's plant on plaintiffs' property constituted a continuing trespass, as a matter of law, is beyond question. Martin v. Reynolds Metals Co., 221 Or. 86, 342 P.2d 790 (1959); Fairview Farms, Inc. v. Reynolds Metals Co., supra; Reynolds Metals Co., et al, v. Lampert, 316 F.2d 272 (9 Cir. 1963), re-hearing denied November 15, 1963, 324 F.2d 465.

■ That equity will intervene to prevent a continuing trespass is well recognized. Anderson v. Miami Lumber Company, 59 Or. 149, 160, 116 P. 1056 (1911); Columbia River Fishermen's Protective Union, et al, v. City of St. Helens, et al, 160 Or. 654, 664, 87 P.2d 195 (1939).

Plaintiffs rely on Fairview Farms, Inc. v. Reynolds Metals Co., supra, and in particular on that portion of the opinion in which it is indicated that an award of compensatory damages for past trespasses and future trespasses would adequately compensate the plaintiffs. The basic reason the Court did not grant an injunction in the Fairview case was that there was no evidence the acts or conduct of Reynolds were reasonably certain to be repeated in the future. Here, of course, the evidence is entirely to the contrary. Here, Harvey has taken the position that it has done everything possible to eliminate the problem, and that it must continue to operate with its present control system. The 1962–1963 improvement by Harvey was of no particular significance.

Also wide of the mark is Reynolds Metals Co. v. Wand, 308 F.2d 504 (9 Cir. 1962). The opinion in Wand makes a point of the fact that the company had recently installed a new system for the minimizing of the escape of the gasses,

fumes and particulates, at a cost of $2,139,185.00, and that there was nothing in the record to show that any further lessening of the escape of such materials was possible. The record before me contains clear and convincing evidence that the defendant has yet to install a hood system over and around the cells, similar to that installed by Reynolds. Defendant can find little comfort in Huber v. Portland Gas & Coke Co., 128 Or. 363, 274 P. 509. The facts there presented bear no relationship to those before me. In Huber, the defendant, without the landowner's consent, buried a gas pipeline in the property in question. Of course, the plaintiff could recover for all damages, past and future, in one action. The question of what might be the result, if plaintiff had asked for a mandatory injunction directing defendant to remove its pipeline, is not discussed. What is said must be read in the light of the issues before the Court.

■ The decision of the Oregon Court in Wolfer v. Hurst, 50 Or. 218, 91 P. 366, is of little, if any, help in disposing of my problem. There, the plaintiff attempted to enjoin the defendants from removing or disposing of a crop of hops from the plaintiff's farm. The Court held there was no showing of an irreparable injury to the estate and that the Court would not enjoin the trespass. Here we have clear and convincing evidence of annual damage to fruit and to the fruit trees. The evidence is undisputed that the continuous deposit of the fluorine on the leaves of the trees will probably severely damage if it does not ruin the trees. In any event, the effect of the decision of the Oregon Court in Wolfer is destroyed by decisions in later Oregon cases including, but not limited to, Boulevard Drainage System v. Gordon, 91 Or. 240, 177 P. 956 and in Chapman v. Dean, 58 Or. 475, 479, 115 P. 154, 155. The Chapman case in speaking of Wolfer said:

"But later authorities establish the doctrine that, where the trespass is continued, made up of successive acts, each comparatively unimportant in itself, and the threat and in-

tention to continue is manifest, equity will enjoin the same, for the reason that each separate trespass forms a separate cause of action, * * *. The authorities are numerous that equity will entertain their bill for that purpose, especially when persistent invasion of plaintiffs' premises would eventually work out the establishment of an easement in favor of the defendants."

Other Oregon cases supporting the Chapman decision are Winslow v. Fleichner, 110 Or. 554, 223 P. 922; Crouch v. Central Labor Council, 134 Or. 612, 293 P.2d 729, 83 A.L.R. 193. I find that the injury in this case is irreparable to each of said plaintiffs and that they would be relegated to pursuing a judicial merry-go-round in actions at law, if they were required to seek a remedy in a Court of law.

## BURDEN OF PROOF

Throughout, I have taken the position that the burden of proof was on the plaintiffs on all issues. I find they have sustained that burden. I am now convinced that once the plaintiffs established that fluorides were deposited on their lands from the plant of the defendant, the burden of going forward with the evidence was on the defendant to show that the use of its property, which caused the injury, was unavoidable or that it could not be prevented except by the expenditure of such vast sums of money as would substantially deprive it of the use of its property. This seems to be the general rule. Herring v. H. W. Walker Co., 409 Pa. 126, 185 A.2d 565 (1962).

The same type of a rule was recognized by the Oregon Supreme Court in Kramer v. Sweet, 179 Or. 324, 169 P.2d 892. It seems that the defendant recognized this rule at the time of drafting its affirmative contentions and placing them in the Pre-Trial Order.[1] Although the contention does not recite that the emissions could not be prevented except by an expenditure which would substantially deprive defendant of the use of its property and, thus, does not go as far as its burden might require, the contention does indicate that defendant felt it had a substantial burden. After the case was closed, and after reading the respective briefs, I was not satisfied and entered an Order[2] on the subject. Despite the direction in this Order, the defendant failed to produce even one disinterested witness as to the over-all efficiency of the plant or other subjects mentioned in the order. Defendant called only its plant manager and made a contention that it did not know how to secure efficiency records from other companies. It is an obvious fact that defendant made no attempt to carry the burden of going forward with the evidence. On the other hand, the plaintiffs called experts, whose testimony was clear and convincing to the effect that the amount of the emitted material could be substantially reduced, or almost eliminated, without an expenditure which would substantially deprive defendant of the use of its property. Frankly stated, there is no good reason why the defendant company, like other companies similarly situated, should not make a reasonable expenditure in the erection of hoods, or like devices, over or around its pots or cells. To require

---

1. (Paragraph V, Pre-Trial Order)
Said plant employs and uses equipment and devices generally recognized and used in the industry to control emissions of harmful and deleterious material all in accordance with and consistent with good engineering practices and economic operation of said plant.
 * * * *

2. * * * *
The record is completely silent as to the over-all efficiency of the defendant's alum-inum reduction plant in controlling the emissions of fluorine, as compared to other aluminum reduction plants, and such record is also silent as to whether the methods of control installed and being used by defendant are as efficient as other available controls. * * * I reserve ruling on who has the burden of proof, but will place the burden of going forward with the evidence on the defendant.
 * * * * *

less would be placing a premium on air pollution. What's good for Reynolds should be good for Harvey, even though the cost of the new system might exceed $2,000,000.00, as it did in the case of Reynolds.

York v. Stallings, 217 Or. 13, 341 P.2d 529 cited by defendant supports the legal theory above mentioned, rather than that claimed by defendant. The author of this opinion happened to be the attorney for plaintiff in the York case. The ultimate holding in that case was that the record was silent on the over-all effect of complying with the lower Court's injunction. The case was remanded to determine "whether such a program would be so burdensome as to cause a shut-down of defendant's mill". The Court was then authorized to enter such a decree as might be consistent with the principles announced. Nothing is said about the burden of proof.

I could cite and analyze numerous other cases which I have read, and which have been cited by industrious counsel for both plaintiffs and defendant. Such citation or analysis would be of no particular benefit to the parties, counsel or the Courts. They all lead to the conclusions herein expressed.

 Defendant's contention that the Oregon Air Pollution Law [3] pre-empts this field is without foundation. Specifically recognized by ORS 449.820 is the right by an individual to prosecute a suit to abate a private or public nuisance. The record in this case is sufficiently broad to be viewed as a suit to abate a nuisance, as well as a suit to enjoin a

continuing trespass. For that matter, a continuing trespass could well be a nuisance. The York cases recognize that the deposit of smoke screenings and particulates on the lands of another amounts to a nuisance. The rule of construction "*expressio unius est exclusio alterius*", for which defendant contends, is not a rule of law, but is a mere guide in determining intent and such a rule must be harmonized with all other rules of construction. In re Moore's Estate, 210 Or. 23, 307 P.2d 483, 65 A.L.R.2d 715, mandate recalled 210 Or. 23, 308 P.2d 180. It is a rule which should be applied with caution and merely as an auxiliary rule to determine the legislative intention. Cabell v. City of Cottage Grove, 170 Or. 256, 130 P.2d 1013, 144 A.L.R. 286; State of Oregon v. Standard Oil Co., 61 Or. 438, 123 P. 40.

Although recognizing a distinction between a trespass and a private nuisance, Martin v. Reynolds Metals Co., supra, involving the same type of affluents as here presented, also recognizes that the words are used interchangeably.[4] The first mention, by the Legislature, of abatement of a nuisance, relating to the pollution of air, was in the enactment of 1959, Chapter 357, Oregon Laws 1959, Section 11.

 In common parlance, a nuisance includes a continuing trespass; a nuisance is defined in Webster's New International Dictionary, 2d Edition, page 1672, as " * * * 2. Law. An offensive, annoying, unpleasant, or obnoxious thing or practice; a cause or source of annoyance, *especially a continuing or repeated invasion or disturbance of another's right.*"

---

3. ORS 449.765 et seq.

 * * * * *

4. "The same conduct on the part of a defendant may and often does result in the actionable invasion of both of these interests, in which case the choice between the two remedies is, in most cases, a matter of little consequence. Where the action is brought on the theory of nuisance alone the court ordinarily is not called upon to determine whether the conduct would also result in a trespassory invasion. In such cases the courts' treatment of the

invasion solely in terms of the law of nuisance does not mean that the same conduct could not also be regarded as a trespass. Some of the cases relied upon by the defendant are of this type; cases in which the court holds that the interference with the plaintiff's possession through soot, dirt, smoke, cinders, ashes and similar substances constitute a nuisance, but where the court does not discuss the applicability of the law of trespass to the same set of facts." (Citing York v. Stallings, supra, and others).

*invasion or disturbance of another's right.* \* \* \* Anything that works a hurt, inconvenience or damage. Blackstone." In construing a statute, words of common use are to be given their natural, plain and obvious meaning. Blalock v. City of Portland, 206 Or. 74, 291 P.2d 218; Cary v. Metropolitan Life Insurance Company, 141 Or. 388, 17 P.2d 1111. Words of common use are to be taken in their natural and obvious meaning and signification. Superior Oil & Refining Syndicate v. Handley, 99 Or. 146, 195 P. 159. Thus, it is seen, that the common ordinary definition of nuisance includes the continued or repeated invasion or disturbance of a right, such as a continuing trespass. Surely, the Oregon Legislature employed the word in that sense when enacting ORS 449.820. Furthermore, all statutes which encroach on personal or property rights of an individual are to be construed strictly, and in the absence of express words or necessary implication, it will be presumed that such statute is not intended to interfere with or prejudice a private right or title. Moore v. Schermerhorn, supra, mandate recalled 210 Or. 23, 308 P.2d 180; Lovell v. School District No. 13, 172 Or. 500, 143 P.2d 236; Marsh v. McLaughlin, 210 Or. 84, 309 P.2d 188.

We must assume that the Oregon Legislature was familiar with this rule of construction and that it never intended, by this legislation, to deprive individuals, such as plaintiffs, of their common law right to enjoin a flagrant violation of those rights nor to pursue their right to enjoin a continuing trespass in a proper Court.

Pinpointing the ever increasing problem of air pollution is the great concern of our national and state legislatures as expressed in the Air Pollution Control Act of 1955, 42 U.S.C. §§ 1857–1857g, as supplemented by the Clean Air Act of 1963, and the Oregon legislation to which I have previously referred.

The defendant will be required to install proper hoods around the cells and electrostatic precipitators in usual, advantageous and proper places in the plant, within one year of the date of the decree. Otherwise, an injunction will issue as prayed for by plaintiffs.

There is no room for application of the doctrine of balancing of the equities at this time. The required improvements should entirely eliminate the problem.

Conforming findings and decree shall be prepared, served and presented by counsel for plaintiffs.