510 P.2d 98

STATE of New Mexico ex rel. David L. NOR-VELL, Attorney General Sierra Club, New Mexico Citizens For Clean Air and Water, Inc. and Harvey Mudd, II, Plaintiffs-Appellees.

v.

ARIZONA PUBLIC SERVICE COMPANY, Public Service Company of New Mexico, Tucson Gas and Electric Company, Southern California Edison Company and El Paso Electric Company, Defendants-Appellants.

No. 9482.

Supreme Court of New Mexico.

May 18, 1973.

Montgomery, Federici, Andrews, Hannahs & Morris, Sumner G. Buell, Santa Fe, for Ariz. Public Service, Southern California Edison, Tucson Gas & Electric Co. and El Paso Electric Co.

Rodey, Dickason, Sloan, Akin & Robb; W. A. Sloan, Albuquerque, James B. Cooney, Farmington, Keleher & McLeod, Russell Moore, Albuquerque, for Public Service Co.

Snell & Wilmer, Phoenix, Ariz., for Arizona Public Service Co.

Holesapple, Conner, Jones, McFall & Johnson, Tucson, Ariz., for Tucson Gas & Electric.

Kemp, Smith, White, Duncan & Hammond, El Paso, Tex., for El Paso Electric.

Tansey, Rosebrough, Roberts & Gerding, Farmington, for appellants.

David L. Norvell, Atty. Gen., Thomas L. Dunigan, Asst. Atty. Gen., Thomas A. Donnelly, Sp. Asst. Atty. Gen., Santa Fe, H. Anthony Ruckel, Sierra Club Legal Defense Fund, Denver, Colo., for appellees.

OPINION

STEPHENSON, Justice.

This action was brought pursuant to §§ 40A–8–1 and 40A–8–5, subd. B, N.M.S.A. 1953 by the New Mexico Attorney General, enviromental groups and an individual (Plaintiffs) in the name of the State of New Mexico in the District Court of San Juan County, seeking injunctive relief to abate alleged public nuisances caused by operation of the Four Corners Power Plant located in northwestern New Mexico.

The complaint contains five claims. The first four claims concern the emission of particulate matter, sulphur oxides, nitrogen oxides and mercury allegedly caused by operation of the Four Corners Power Plant. The fifth claim is in effect a general request that amendment of the complaint be permitted when other emissions may become known prior to trial. The prayer for relief asks that emissions constituting the nuisances be abated; that a mandatory injunction issue requiring installation of assorted types and forms of equipment, alterations in the present mechanical makeup of the plant and fuel used, and continued

monitoring and reporting procedures to the District Court of San Juan County, and for costs and attorneys' fees.

Defendants, owners and operators of the plant, filed motions to dismiss based upon several grounds:

(1) the district court lacks jurisdiction of the subject matter,

(2) the court should not exercise jurisdiction in this action,

(3) the complaint fails to state a claim upon which relief may be granted, and

(4) the plaintiff failed to join an indispensable party.

The district court entered its written opinion concluding that defendants' motions should be denied and an order, denying defendants' motions, and certifying that its order and written opinion involve controlling questions of law as to which there is a substantial ground for difference of opinion, and that an immediate appeal therefrom may materially advance the ultimate termination of the litigation.

Defendants filed an application for an order allowing appeal pursuant to § 21–10–3, N.M.S.A.1953. This court granted the application.

In order to aid in understanding this litigation, the nature of defendants' claims, and our disposition of this appeal, some review of existing statutory schemes for control of pollution, as well as activities of the regulatory authorities and the defendants, seems essential. This we will undertake to do in a manner as brief as this complex subject permits, relying to an extent upon defendants' summary, the accuracy of which has not been questioned.

The statutes comprising the legislative scheme for control and abatement of air and water pollution, and which are, therefore, central to this litigation are:

The Air Quality Control Act, enacted in 1967.[1]

The Water Quality Act, enacted in 1967.[2]

The Environmental Improvement Act, enacted in 1971.[3]

The New Mexico Air Quality Control Act of 1967 designated the State Board of Public Health as the air pollution control agency for all purposes under federal legislation relating to air pollution. The act also specifically authorizes the board to:

(a) prevent or abate air pollution;

(b) develop plans for the regulation, control, prevention or abatement of air pollution;

(c) classify and record air contaminant sources;

(d) encourage voluntary co-operation in the preservation, restoration or improvement of air purity;

(e) develop facts and make investigations and studies, the results of which are to be reduced to writing if any enforcement action is contemplated, and a copy thereof furnished to the owner or occupants of the premises before the action is filed;

(f) cause legal proceedings to be instituted to compel compliance with the Air Quality Control Act.[4]

The act, as amended, authorizes the board to require any person emitting an air contaminant to (a) install, use and maintain monitoring devices; (b) sample emissions; (c) maintain records of the nature and amounts of emissions; (d) furnish reports on performance of emission control devices; and (e) provide other information relating to emission of air contaminants.[5]

The act contains the following provision:

"The Air Quality Control Act * * * is supplementary to other legislation, and

1. §§ 12–14–1, through 13, N.M.S.A.1953.

2. §§ 75–39–1, through 12, N.M.S.A.1953.

3. §§ 12–19–1, through 13, N.M.S.A.1953. (Supp.1971)

4. § 12–14–5, N.M.S.A.1953.

5. § 12–14–5E, N.M.S.A.1953 (1972 Interim Supp.)

does not repeal any laws except those in direct conflict therewith. All county and municipal ordinances, and all state, county and municipal regulations relating to air quality and air pollution, are continued in effect * * * unless revised or repealed * * * ".[6]

The New Mexico Water Quality Act of 1967 is pertinent because of plaintiffs' fourth claim which relates to mercury emissions. It designated the Water Quality Control Commission as the water pollution control agency for this state. The Commission was charged with the duty to (1) adopt a "comprehensive water quality program"; (2) "adopt water quality standards as a guide to water pollution control"; and (3) "adopt, promulgate and publish regulations to prevent or abate water pollution * * *."[7] The act also (1) conferred upon the Commission the power to "seek injunctive relief against any violation or threatened violation" of its regulations;[8] (2) requires what is now known as the Environmental Improvement Agency to provide testing and technical services to the Commission;[9] and (3) conferred upon the New Mexico Department of Public Health (later transferred to the Environmental Improvement Agency), under emergency conditions, authority to seek injunctive relief to "abate the water pollution creating the emergency condition."[10]

The act was amended in 1970 by the addition of a provision authorizing an additional means of enforcement through acceptance of a written assurance of discontinuance of action deemed to be in violation of the Water Quality Act or any regulation promulgated thereunder.[11]

Pursuant to the act, the Commission has (a) developed a comprehensive water quality program; (b) adopted water quality standards as a guide to the control of water

pollution; and (c) promulgated and published regulations for the prevention and abatement of water pollution.

In 1971, recognizing the necessity of creating an agency to "be responsible for environmental management" to insure an environment that in the "greatest possible measure" will assure "optimum health, safety, comfort and economic and social well-being, * * * will protect this generation as well as those yet unborn from health threats posed by the environment; and will maximize the economic and cultural benefits of a healthy people,"[12] the New Mexico Legislature enacted the Environmental Improvement Act. The purpose of the act as set forth in § 12–19–2, "is to create an agency which will be responsible for environmental management * * * in this state * * *." All functions and duties of the Environmental Services Division of the Health and Social Services Department (formerly State Board of Health) were transferred to the Environmental Improvement Agency,[13] such transfer included the administration of the Air Quality Control Act and pertinent portions of the Water Quality Act.

Section 12–19–9 of the act empowers the Environmental Improvement Agency (the "Agency") to "serve as agent of the State of New Mexico in matters of environmental management" and to "enforce the rules, regulations and orders promulgated by the board and environmental management * * * laws for which the agency is responsible by appropriate action in courts of competent jurisdiction * * *." That section also grants to the Agency such other powers as may be necessary and appropriate for the exercise of the powers and duties delegated to it.

Section 12–19–10, specifying the duties of the Agency placed with the Agency the

6. § 12–14–13, N.M.S.A.1953.

7. § 75–39–4, N.M.S.A.1953.

8. § 75–39–9, N.M.S.A.1953.

9. § 75–39–4, subd. E, N.M.S.A.1953.

10. § 75–39–10, N.M.S.A.1953.

11. § 75–39–9, subd. D, N.M.S.A.1953 (Supp.1971)

12. § 12–19–2, N.M.S.A.1953.

13. § 12–19–4, N.M.S.A.1953.

responsibility for environmental management and imposed upon it the duty to maintain and enforce rules, regulations and standards in certain environmental areas. It declared that water pollution, air quality management, nuisance abatement and environmental injury prevention are "to the extent that these programs are not expressly delegated by law to another agency or political subdivision * * * now or hereafter made the responsibility of the agency by law. * * *"

Section 12–19–11 requires the Environmental Improvement Board (the "Board") to promulgate rules, regulations and standards in specified environmental areas, including air quality management, nuisance abatement and environmental injury prevention.

Section 12–19–13 provides that no regulation or emission control requirement or amendment or repeal thereof shall be adopted until after a public hearing by the Board within the area of the state concerned. The statute sets forth the requirements for notice of the hearing date and subject matter of such hearing and also provides that at the hearing the Board shall allow all interested persons reasonable opportunity to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing. The statute provides that any person who is or may be affected by a regulation adopted by the Board may appeal to the Court of Appeals for further relief. All appeals are by statute required to be upon the record made at the hearing. On appeal, the court can set aside the regulation only if it is found to be (1) arbitrary, capricious or an abuse of discretion, (2) not supported by substantial evidence in the transcript, or (3) otherwise not in accordance with law.

Because the Board may also exercise federal enforcement powers under federal air quality legislation, the relevant provisions of that legislation are pertinent to the activities and responsibilities of the state agency. Section 101(a)(3) of the Clean Air Act of 1967, 42 U.S.C. § 1857 et seq., as amended by the Federal Air Quality Act of 1967, Public Law 90–148, and by the Clean Air Act Amendments of 1970, Public Law 91–604, declares the prevention and control of air pollution at its source to be the primary responsibility of state and local governments.

Under § 109(b) of the Clean Air Act, 42 U.S.C. § 1857c–4 "primary ambient air quality standards" are defined as standards, the attainment and maintenance of which, "* * * allowing an adequate margin of safety, are requisite to protect the public health."

Similarly, "secondary ambient air quality standards" are those "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air."

The act requires each state to adopt and submit to the administrator of the federal act a plan which provides for the implementation, maintenance and enforcement of such primary and secondary standards.[14] If the administrator finds the state procedure adequate, he must delegate to the state his authority to implement and enforce such standards.[15]

Affidavits of the Acting Director of the Agency, Director of the Agency, and its Chief Attorney establish that the Environmental Improvement Board and its predecessor, the Health and Social Services Board, together with the Water Quality Control Commission, have developed air and water quality programs, adopted air and water quality standards and promulgated regulations for the achievement and maintenance of such standards and the prevention and abatement of air and water pollution. Because the Four Corners Power Plant is the only coal burning electric generating plant in New Mexico, the regu-

14. 42 U.S.C. § 1857c–5(a)(1) (1970).

15. 42 U.S.C. § 1857c–6(c)(1) (1970).

lations pertaining to such plants [16] are obviously directed specifically to it. As recently as March 25, 1972, the Board promulgated new regulations governing emission from coal burning equipment of the specific air contaminants identified in the first, second and third claims alleged in the complaint, i. e., fine particulate, sulphur oxides and nitrogen oxides.

The affidavits establish that the Agency has been and is presently engaged in research, study and investigation of mercury, the contaminant identified in the fourth claim of the complaint and that it will propose the adoption of a regulation governing the emission of mercury if the results of the studies indicate the need therefor.

Pursuant to § 12–14–5, subd. B(2), the following reports, data and information concerning the Four Corners Power Plant are furnished to the Agency:

(a) Semi-annual progress reports on Air Pollution Control improvements.

(b) Daily logs for monitoring the performance of the electrostatic precipitators, which logs are submitted monthly.

(c) Periodic reports on water use and consumption.

(d) Telephone reports of unusual occurrences.

(e) Upon request, telephone reports of coal consumption vs. power output levels.

The Agency makes irregular and unannounced sampling of stack emissions of the Four Corners Power Plant, obtains samples of coal and collected fly ash, obtains ash pond effluent samples at unannounced intervals, and maintains particulate and sulphur dioxide monitoring stations in San Juan Basin.

To comply with the air quality regulations of the State of New Mexico, and pursuant to the schedule of compliance with regard to Units 1, 2 and 3 of the Four Cor-

ners Power Plant approved by the Board on June 27, 1970, scrubber units were installed prior to December 31, 1971. It is anticipated that installation of the scrubber units will improve the control of particulate matter to a manufacturer's guaranteed operating efficiency of 99.2 percent. As of the date of the affidavit, the approximate cost of these units was $21,500,000.

To comply with regulations which become effective on December 31, 1973, and pursuant to a schedule of compliance with regard to Units 4 and 5 of the Four Corners Plant first approved by the Board on June 27, 1970, the participants have committed themselves to the installation of additional air quality devices for those units.

Appellants first contend that the Environmental Improvement Act, Air Quality Control Act and Water Quality Act provide a comprehensive system of regulation of air and water pollution and thus repeal by implication the public nuisance statute under which this case is brought (§§ 40A–8–1 and 5, subd. B, supra). We have reviewed the cases relied upon to invoke these principles. None of them involve a factual setting in which the legislature has created an administrative remedy for a problem without repealing a judicial remedy which has long existed to deal with the same problem. In most of the cases which we have studied involving the creation of administrative procedures to deal with the complex problem of environmental control, arguments that the administrative remedies abrogate long-standing judicial remedies have been rejected, absent a clear legislative intent to the contrary. See Renken v. Harvey Aluminum (Incorporated) 226 F.Supp. 169 (D.Or.1963); Venuto v. Owen-Corning Fiberglas Corporation, 22 Cal.App.3d 116, 99 Cal.Rptr. 350 (1971); Ellison v. Rayonier, Incorporated, 156 F.Supp. 214 (W.D. Wash.1957); Ohio River Sand Company v. Commonwealth, 467 S.W.2d 347 (Ky.1971); White Lake Improvement Ass'n v. City of Whitehall, 22 Mich.App. 262, 177 N.W.2d

16. Ambient Air Quality Standards and Air Quality Control Regulation 504, adopted January 23, 1970, amended March 25, 1972. Air Quality Control Regulations 602 & 603, adopted March 25, 1972.

473 (1970); Houston Compressed Steel Corp. v. State, 456 S.W.2d 768 (Tex.Civ. App.1970); State v. Dairyland Power Cooperative, 52 Wis.2d 45, 187 N.W.2d 878 (1971); Commonwealth v. Glen Alden Corporation, 418 Pa. 57, 210 A.2d 256 (1965).

Fact situations may arise in which the nuisance statutes ought to remain available. Moreover, the wisdom and efficacy of our disposition of the issues of this appeal will be tested by time, and may be found wanting. For these reasons we decline to pass upon the question of whether the nuisance statutes were by implication repealed, either generally or specifically in the field of pollution control, by passage of the later legislation. In any case, we do not regard the issue of repeal by implication as the pivot on which this case should turn.

We see the problem before us not as one exclusively of remedy, but one of coordination between the judicial and administrative arms of government. In United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939) the United States Supreme Court expounded upon the need for such coordination:

" * * * [C]ourt and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through co-ordinated action."

Traditionally, coordination between the judicial and administrative branches has been accomplished through the doctrines of exhaustion of administrative remedies and primary jurisdiction, the applicability of which forms the basis of appellants' second set of arguments. In United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) the relationship of the doctrines was explained:

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361."

Also, see 3 Davis Administrative Law Treatise § 19.01 (1958).

■ If either exhaustion of remedies or primary jurisdiction is applicable here, it is apparent that it is the latter, for the claim of public nuisance was originally cognizable in the courts of this state by statute. The basic issue, therefore, is whether the particular public nuisance claim here requires the resolution of issues which have been placed within the special competence of an administrative agency. In Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952) the U. S. Supreme Court said in resolving a similar problem:

" * * * [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise

for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

We come now to the problem of applying the principles of primary jurisdiction to the facts before us. In doing so, the precedents on the subject recognize a degree of leeway, sometimes spoken of as consisting of "flexibility" in the doctrine itself and on other occasions as "discretion" in the court. Whatever the mode of expression, it amounts to about the same thing. Illustrative of this concept, in the discussion of the doctrine of primary jurisdiction, Davis, supra, § 19.09 states:

"Not only is the doctrine judge-made but the original case creating the doctrine (Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)) overrode explicit and unequivocal statutory provisions allowing the courts to act initially. The principal criterion in deciding whether the doctrine is applicable usually is not legislative intent but usually is judicial appraisal of need or lack of need for resort to administrative judgment."

And in 2 Am.Jur.2d Administrative Law § 796 it is said:

"The doctrine of primary jurisdiction is not rigid but flexible, and a court is not without discretion in its application."

Couched in terms of discretion is Wisconsin Collectors Assn. v. Thorp Finance Corp., 32 Wis.2d 36, 145 N.W.2d 33 (1966). The court made the following analysis:

" * * * [W]e believe it improper to couch such priority in terms of power or jurisdiction. The standard, in our opinion, should not be power but comity. The court must consider which course would best serve the ends of justice. If the issue presented to the court involves exclusively factual issues within the peculiar expertise of the commission, the obviously better course would be to decline jurisdiction and to refer the matter to the agency. On the other hand, if statutory interpretation or issues of law are significant, the court may properly choose in its discretion to entertain the proceedings. The trial court should exercise its discretion with an understanding that the legislature has created the agency in order to afford a systematic method of fact finding and policymaking and that the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention."

A number of considerations lead us to our decision. It is obvious that the administrative scheme of the state, as evidenced by the acts to which we have referred, operates in exactly the same field as that in which plaintiffs would have the trial court function. There is little, if anything, before us to indicate that the Agency has wanted for diligence or efficiency, although the plaintiffs do argue the existence of certain shortcomings in the scope and content of the regulations. We note in passing that plaintiffs, so far as we know, failed to assert these contentions by appeal to the Court of Appeals. Section 12–19–13, supra. Nothing indicates to us that the district court is likely to formulate better regulations.

Complaint is also made that certain regulations do not become effective until January 1, 1975. This raises the element of time. We accept the proposition that pollution is bad, and that the rights of those adversely affected are violated. It is nevertheless equally obvious that it has taken mankind a considerable period to befoul the planet, and more time will elapse before solutions are found and implemented. This is certainly not to say that solutions should be pursued at a leisurely pace. Quite the contrary.

The complaint itself does not actually ask the district court to indulge in any such

simplistic solution as to enjoin defendants from permitting anything to come out of their stacks. Various devices and procedures of a more sophisticated type are sought. For example in the first claim relating to particulate matter, plaintiffs seek such things as installation of filter type devices known as "bag houses."

It is clear that one does not simply call a local contractor to build a "bag house." They apparently must be designed, financed, purchased, constructed, installed and tested at a cost of millions of dollars. The complaint therefore contemplates the passage of considerable time even if plaintiffs get what they seek. And, from the affidavits on file, we understand that the activities we have enumerated concerning bag houses are presently in progress. We fail to see what would be gained at this juncture by involvement of the district court in existing remedial activities. We have cited bag houses as an example of contemplated passage of time, but the same is true of other types of relief sought.

Finally, in their fourth claim plaintiffs complain that defendants are polluting waters by mercury emissions, and point out that the agency has adopted no regulations in respect to mercury emissions. It appears that the Agency is actively studying the problem with a view to adopting such regulations. Plaintiffs would have the trial court immediately come to grips with the mercury problem. Such a task was discussed by the U. S. Supreme Court in Ohio v. Wyandotte Chems. Corp., 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971):

"It can fairly be said that what is in dispute is not so much the law as the facts. And the factfinding process we are asked to undertake is, to say the least, formidable. We already know, just from what has been placed before us on this motion, that Lake Erie suffers from several sources of pollution other than mercury; that the scientific conclusion that mercury is a serious water pollutant is a novel one; that whether and to what extent the existence of mercury in natural waters can safely or reasonably be toler-

ated is a question for which there is presently no firm answer; and that virtually no published research is available describing how one might extract mercury that is in fact contaminating water. Indeed, Ohio is raising factual questions that are essentially ones of first impression to the scientists. The notion that appellate judges, even with the assistance of a most competent Special Master, might appropriately undertake at this time to unravel these complexities is, to say the least, unrealistic."

By nothing before us is it made to appear that the trial court could solve the mercury problem either more quickly or better than the Agency.

All of the plaintiffs' claims involve areas in which the Agency is active. Based upon the information available to us, we are concerned lest the intervention of the trial court would add little to, or even hamper, the solution of the overall problem. In City of Chicago v. General Motors Corporation, 332 F.Supp. 285, (N.D.Ill.1971), an air pollution case, the court said:

"While the state and federal governments may not be moving as swiftly as plaintiff would like in this area, the fact remains that legislative and administrative guidelines and programs have been initiated. It would be improper for this Court to exercise its equitable jurisdiction to interfere with the comprehensive programs designed to solve a complex social, economic and technological problem. Quite simply, we choose not to pollute the scene with still more studies and standards."

The legislature has clearly intended that the Agency should have primary jurisdiction over pollution control. While primary jurisdiction cases may not turn solely on legislative intent, it is a factor that is entitled to be considered. We are of the opinion that the Agency does have primary jurisdiction.

Although the statutes do not provide for a procedure, by which plaintiffs may apply to the Agency for relief or for the Agency to grant relief to plaintiffs, the Agency has

the power and duty to seek relief from the courts. Nothing precludes plaintiffs from referring their claims to the Agency.

We are not convinced that the Agency has failed to perform the duties enjoined upon it by law. Should it fail to diligently function in the areas of its responsibility, means are available to compel it to do so.

Our disposition of this appeal makes consideration of other points raised by defendants unnecessary.

The order of the trial court refusing to dismiss the complaint is reversed, and the case remanded for further proceedings consistent with this opinion.

It is so ordered.

OMAN and MONTOYA, JJ., concur.