SCHWARTZMAN, INC., Plaintiff,

v.

ATCHISON, TOPEKA & SANTA FE RAILWAY CO., Defendant.

Civ. No. 93–0307 JB.

United States District Court,
D. New Mexico.

June 29, 1994.

See also: 842 F.Supp. 475.

840

John M. Eaves, Paul G. Bardacke, David V. Halliburton, Eaves, Bardacke & Baugh, Albuquerque, NM, for plaintiff.

Peter J. Adang, Rita G. Siegel, Peter J. Adang, P.C., Albuquerque, NM, for defendant.

## *SUMMARY JUDGMENT*

BURCIAGA, Chief Judge.

THIS MATTER came on for a hearing on June 28, 1994, on Defendant's February 15, 1994 motion for summary judgment as to counts I, IV, and VIII, Defendant's February 15, 1994 motion for partial summary judgment on counts II and III, and Defendant's February 15, 1994 motion for summary judgment on counts VI and VII. Having reviewed the pleadings, the relevant law, and having heard the arguments of counsel, the Court finds Defendant's motion as to counts I, IV, and VIII is well taken in part and is granted in part. Defendant's motion as to counts II and III is not well taken and is denied. Defendant's motion for summary judgment as to count VI is well taken and is granted. Count VII of Plaintiff's complaint, alleging strict liability for abnormally dangerous activity, must be tried to the Court.

Plaintiff owns land in the South Valley area of Bernalillo County. Defendant Atchison, Topeka and Santa Fe Railway Co. ("ATSF") owns a wood treatment and preservation facility adjacent to Plaintiff's property. From 1908 to 1972, Defendant used this facility to treat and preserve wooden railroad ties. On February 15, 1993, Plaintiff filed a complaint, subsequently removed to federal court, alleging Defendant improperly stored and disposed chemical waste which contaminated the groundwater and rendered Plaintiff's adjacent property unmarketable.

Plaintiff advances numerous theories of recovery. Plaintiff has withdrawn count I. Count II alleges trespass, count III avers private nuisance, count IV is a public nuisance claim, count V (not at issue here) alleges negligence, count VI alleges negligence *per se,* count VII advances a strict liability cause of action, and count VIII is a claim for punitive damages.

Summary judgment is appropriate only where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Addickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court must view the record in the light most favorable to the existence of triable issues. *Exnicious v. United States,* 563 F.2d 418, 423–24 (10th Cir.1977).

## MOTION FOR SUMMARY JUDGMENT ON COUNTS I, IV, AND VIII [1]

### Injunctive Relief Claims

In count IV of the complaint, Plaintiff avers a public nuisance cause of action, seeking an order of abatement of Defendant's alleged nuisance: "Plaintiff prays for an order of this Court instructing Defendant to abate the public nuisance ... by investigating, containing, and remediating the soil and groundwater...." Complaint at ¶ 73. In addition, count III, a private nuisance claim, requests as relief an order enjoining Defendants from further contaminating the groundwater. Defendant requests that the Court dismiss these claims for injunctive relief pursuant to the doctrine of primary jurisdiction.

The United States Environmental Protection Agency ("EPA"), the New Mexico Department of the Environment, ("NMED"), and Defendant ATSF are currently undertaking efforts to investigate and remediate the tie-treatment site. On October 14, 1992, the EPA proposed listing the ATSF site on the National Priorities List ("NPL"). National Priorities List for Uncontrolled Hazardous Waste Sites, Proposed Rule No. 13, 57 Fed.Reg. 47,204 (1992). The NPL is a listing of the nation's most contaminated sites. The ATSF site received a "hazardous ranking system" ("HRS") score of 50. The HRS serves as a screening mechanism and evaluates the relative potential of hazardous substances to threaten health or the environment. Those sites that score 28.5 or greater are eligible for inclusion on the NPL. In a letter from the EPA to ATSF discovered by Plaintiff, the EPA stated, "Generally, when a site receives a hazard ranking system score as high as 50, such as this site did, it is usually placed on the NPL." If and when the site is placed on the NPL, it becomes eligible for CERCLA-financed remedial action in the form of expenditures from the CERCLA Trust Fund, or "Superfund."

Further, ATSF and the EPA are currently negotiating or have already finalized an ad-ministrative order on consent for a "remedial investigation and feasibility study" ("RI/FS"). The purpose of a RI/FS is to assess site conditions and evaluate remedial alternatives. Although a RI/FS is generally conducted after placement on the NPL, the EPA occasionally elects to conduct a RI/FS on a site proposed for NPL listing for various reasons, "such as when the Agency believes that a delay may create unnecessary risks to public health or environment." National Priorities List for Uncontrolled Hazardous Waste Sites, *supra*, at 47,206. In short, then, Defendant is already engaged in an extensive EPA/NMED-supervised investigation and cleanup of the site, a task that appears to be expedited by the EPA.

■ The common law doctrine of primary jurisdiction provides courts with flexible discretion to refer certain matters to a specialized administrative agency. The doctrine applies to claims which are properly cognizable in federal court, but which contain some issue within the special competence of an administrative agency. "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). New Mexico law also recognizes the doctrine. "[T]he legislature has created the agency in order to afford a systematic method of fact-finding ... and the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention." *State ex rel. Norvell v. Arizona Public Service Co.,* 85 N.M. 165, 171, 510 P.2d 98 (1973). The doctrine suspends "the judicial process ... pending referral of the issues to the administrative body for its views." *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1376–77 (10th Cir.1989).

■ No fixed formula constrains the Court's exercise of its discretion to invoke the doctrine of primary jurisdiction, as the determination is largely fact-specific. *Brad-*

---

1. Plaintiff has withdrawn count I and the claim for creation of a medical monitoring fund in count IV.

*ford School Bus Transit v. Chicago Transit Authority,* 537 F.2d 943, 949 (7th Cir.1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Various factors, however, guide a judge's decision to defer to an agency in this context.

First, the Court should consider whether it is being called upon to decide factual issues which are not within the conventional experience of judges, or are instead issues of the sort that a court routinely considers. *Id.* at 1377. Should the Court entertain Plaintiff's public nuisance claim, and should Plaintiff prevail on this claim, the Court would have to fashion an appropriate investigatory and remediation order. Such an order would have to specify the proper number and placement of monitoring wells, how deep the wells should be drilled, the adequacy of various proposed sampling methods, and other details of the investigation and cleanup effort. The Court would have to assess whether ATSF has adequately investigated the groundwater contamination, or whether further investigation would be necessary; whether ATSF's methods of remediation are adequate; what level of contamination is tolerable or acceptable; and a myriad other technical matters. Theoretically, the Court could receive extensive expert testimony, or appoint a special master, but such methods would represent a serious drain of judicial resources and would largely duplicate the present efforts of the EPA and the NMED. Evaluating the proper components of such a plan is best left to the EPA, a body that is far better suited to resolve such issues by reason of "specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference,* 342 U.S. at 575, 72 S.Ct. at 494. If Plaintiff's ultimate goal is remediation of the site, this goal would be achieved faster and more efficiently through the joint efforts of the EPA and the NMED without interference from the Court.

■ Second, the Court should consider whether Defendant could be subjected to conflicting orders of both the Court and the administrative agency. Should this Court independently determine an appropriate investigatory and remediation plan, aspects of the plan may contradict the pending RI/FS,

and subject ATSF to conflicting obligations. One purpose of the doctrine of primary jurisdiction is to promote uniformity and harmony in the regulatory sphere the agency is entrusted to govern. *Nader v. Allegheny Airlines,* 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1377 (10th Cir.1989). This purpose would be served in this case by deferring the remedial plan to the EPA and the NMED.

A third factor courts have considered in this context is whether relevant agency proceedings have actually been initiated. In *Roberts v. Chemlawn Corp.,* 716 F.Supp. 364 (N.D.Ill.1989), the court was asked to defer to the EPA the determination of whether certain pesticides were harmful. While the court admitted that deferring technical aspects of the case to the EPA was "far preferable," the court nevertheless declined to invoke the doctrine of primary jurisdiction. *Id.* at 365. The court retained jurisdiction because of a significant delay attributable to EPA review of pesticides. That the review process would even begin within the following two to three years was speculative at best. *Id.* at 365–66. The court was careful to note that had the agency process begun, its decision would have been different. " 'It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency.' " *Id.,* quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 420 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). In this case, the EPA has already begun the process of initiating a remedial investigation and feasibility study pursuant to the ATSF site's likely inclusion on the National Priorities List.

■ Fourth, courts consider whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to languish. Administrative delay constitutes reason to retain jurisdiction. *Roberts,* 716 F.Supp. at 366; *In re "Agent Orange" Product Liability Litigation,* 475 F.Supp. 928, 933 (E.D.N.Y.1979). Here, Plaintiff points to Defendant's failure to investigate the site to the satisfaction of the EPA or the NMED and

the length of time consumed thus far. However, the fact that the EPA has shown intolerance towards the apparent contumaciousness of Defendant proves that the EPA is in fact diligently pursuing ultimate cleanup of the site. Plaintiff fails to indicate how the EPA has been dilatory or has proven inadequate to the task of prodding ATSF to accept responsibility for remediation; moreover, Plaintiff fails to show how this Court would be more effective at ensuring compliance than the EPA. The EPA has promptly discovered shortcomings in ATSF's investigatory methods and has led ATSF to shore up gaps in the collected data. Contrary to Plaintiff's bald assertions, deferral to the EPA would not relegate Plaintiff to an "administrative limbo." *In re Agent Orange,* 475 F.Supp. at 933. That the EPA has already initiated a RI/FS before placement of the site on the National Priorities List demonstrates EPA's diligence. In fact, Plaintiffs could expect more delay should this Court assume the role of scientific tribunal. In any event, and as was the case in *State ex. rel. Norvell v. Arizona Public Service Co.,* 85 N.M. 165, 172, 510 P.2d 98 (1973), Plaintiff's complaint "contemplates the passage of considerable time even if plaintiffs get what they seek." *Id.*

■ And finally, the type of relief requested by Plaintiff should be considered. Courts refuse to defer jurisdiction if the plaintiff is seeking damages for injury to property or person, as this is the type of relief courts routinely consider; however, if injunctive relief is called for, requiring scientific or technical expertise, the doctrine is more readily applicable. *See Ryan v. Chemlawn Corp.,* 935 F.2d 129, 131 (7th Cir.1991) (because Plaintiff dropped claim for injunctive relief, lower court improperly invoked doctrine); *O'Hare v. Valley Utilities, Inc.,* 89 N.M. 105, 111, 547 P.2d 1147 (Ct.App.) (injunctive relief is "identical to the relief which the agency could have granted" and therefore primary jurisdiction lies with the agency), *rev'd in part on other grounds,* 89 N.M. 262, 550 P.2d 274 (1976). Should this court stay the proceedings with respect to count IV and the injunctive relief requested in count III, Plaintiff may yet pursue monetary damages under the theories of negligence, trespass, private nuisance, and strict liability, which would include any costs necessary for cleanup. Additionally, if the EPA's plan for investigation and cleanup is successful, the Plaintiff will have achieved its goals. If not, judicial review under CERCLA, at 42 U.S.C. § 9613 (1988), is available. *See Pueblo de Cochiti v. United States,* 647 F.Supp. 538, 543 (D.N.M. 1986) (Invoking the doctrine; "If the [agency] resolves the substantive claim in Plaintiff's favor, further litigation will be unnecessary. If Plaintiffs are unsuccessful in the agency hearing, judicial review by the federal court is still available.").

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff asserts CERCLA-inspired remediation efforts by the EPA are not designed to subvert assertion of alternative remedies, citing 42 U.S.C. § 9659(h) (CERCLA "does not affect or otherwise impair the rights of persons under Federal, state or common law...."). Plaintiff misses the point of primary jurisdiction. The doctrine applies when the agency and the court entertaining Plaintiff's claims have concurrent jurisdiction, but the court, for the reasons stated above, believes it prudent to decline to exercise its jurisdiction in favor of the expertise of the agency.

[T]he original case creating the doctrine (*Texas & P.R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426 [27 S.Ct. 350, 51 L.Ed. 553] (1907)) overrode explicit and unequivocal statutory provisions allowing the courts to act initially. The principal criterion in deciding whether the doctrine is applicable is not legislative intent but usually is judicial appraisal of need or lack of need for resort to administrative judgment.

*Norvell,* 85 N.M. at 171, 510 P.2d 98 (quotations and citations omitted). Plaintiff also complains about the lateness of Defendant's primary jurisdiction argument. However, the primary jurisdiction doctrine can be invoked "sua sponte by the court, and thus its invocation cannot be waived ... [T]he doctrine exists for the proper distribution of power between judicial and administrative bodies, and not for the convenience of the

parties." 2 Fed.Proc.L.Ed. § 2:320 (1994) (citations omitted).

In summary, "[i]t would be improper for this Court to exercise its equitable jurisdiction to interfere with the comprehensive programs designed to solve a complex social, economic and technological problem. Quite simply, we choose not to pollute the scene with still more studies and standards." *Norvell*, 85 N.M. at 172, 510 P.2d 98. Defendant is requesting the Court to dismiss Plaintiff's injunctive relief claims pursuant to the doctrine of primary jurisdiction. However, the preferred approach is that "jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal," even if without prejudice. *Northern Cal. Dist. Council of Hod Carriers, AFL–CIO v. Opinski*, 673 F.2d 1074, 1076 (9th Cir.1982). Accordingly, the Court will stay Plaintiff's claims for injunctive relief in counts III and IV. In light of the resolution of this issue, the Court need not address Defendant's other contentions regarding count IV.

### Punitive Damages Claim

ATSF argues that Plaintiff's punitive damages claim, averred in count VIII, is "simply a prayer for relief without an underlying cause of action." Defendant's Memo. in Support at 24. Count VIII incorporates all of the allegations of the complaint by reference, and punitive damages are recoverable under Plaintiff's causes of action. Defendant's argument is meritless.

### MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS II AND III

■ Count II of Plaintiff's complaint alleges trespass. Trespass is defined as a direct infringement of another's right of possession. *Pacheco v. Martinez*, 97 N.M. 37, 41, 636 P.2d 308 (Ct.App.1981). *See also* Restatement (Second) of Torts § 158 ("One is subject to liability to another for trespass, irrespective of whether he thereby causes harm ..., if he intentionally (a) enters land [of another or] causes a thing or third person to do so...."). A trespass may be committed on or beneath the surface of the earth. Restatement (Second) of Torts § 159 (1977). Count III avers maintenance of a private

nuisance. A private nuisance is defined as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D (1977). Defendant asserts that these claims should be dismissed because no genuine issue of material fact exists to support Plaintiff's contention that contamination has migrated on Plaintiff's property.

■ The theoretical differences between trespass and nuisance are important in this case. A claim of trespass contemplates actual physical entry or invasion, whereas nuisance liability arises merely by virtue of activity which falls short of tangible, concrete invasion, so as not to interfere with possession, but nevertheless interferes with the use and enjoyment of the land. *Id.* at cmt. d (distinguishing trespass and nuisance; "[a] trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it. A nuisance is an interference with the ... private use and enjoyment of the land, and does not require interference with possession."). In *Padilla v. Lawrence*, 101 N.M. 556, 685 P.2d 964 (Ct.App.1984), the New Mexico Court of Appeals explained this "traditionally accepted distinction between nuisance and trespass." *Id.* at 562, 685 P.2d 964. The Court wrote:

A trespass is a direct infringement of another's right of possession. Where there is no physical invasion of property, as with intangible intrusions such as noise and odor, the cause of action is for nuisance rather than for trespass.... *The entrance onto property of blowing particulate matter also is not actionable as trespass in the absence of a finding that the matter settled upon and damaged plaintiffs' property.*

*Id.* at 563, 685 P.2d 964 (citations omitted) (emphasis added). The italicized language demonstrates that for the groundwater contamination to be actionable under trespass, the contamination must have reached Plaintiff's property and damaged it.

■ Plaintiffs allege that all of its tracts have been trespassed upon by Defendant's alleged horizontal migration of contaminants in the groundwater, and that this contamina-

tion also constitutes a nuisance. This alleged contamination includes tracts 14 north, 14 south, 10 north, 10 south, 9 north, 9 south, and tract 15 of Plaintiff's property. As to tract 14 north, ATSF conducted limited soil and groundwater testing and found some evidence of creosote contamination. Aside from tract 14 north, however, the only evidence of physical contamination of the other tracts is based on the opinions of Plaintiff's experts. Plaintiff has not done any soil or groundwater testing of the other tracts, and incredibly, does not intend to conduct such testing:

> [Plaintiff] acknowledges that it has not taken physical samples of soil and groundwater on Tracts 9 [north and south], 10 [north and south], 14 South or 15. [Plaintiff] disputes that such samples are required to prove its claims against ATSF. It is ATSF's duty to investigate, define, and abate its contamination of [Plaintiff's] property.

Plaintiff's Memo. in Response at 5. Apparently, Plaintiff labors under the quite mistaken notion that it is Defendant who bears the burden of proof in this case. To survive summary judgment, Plaintiff must identify *specific facts*, Fed.R.Civ.P. 56(e), which show physical invasion of contaminants. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (party in opposition to summary judgment must show "sufficient support" for essential elements of its case).

Due to Plaintiff's dearth of evidence demonstrating contamination of the groundwater directly underneath Plaintiff's property, Defendant contends Plaintiff's trespass and nuisance claims must fail. However, actual physical invasion of the contamination is a requisite element only of Plaintiff's trespass claim. As discussed, nuisance does not require physical invasion of possession, but only interference with use and enjoyment. Defendant does not dispute that tract 14 north's groundwater is contaminated. If any

part of the aquifer underlying Plaintiff's property is contaminated, then use and enjoyment of all of Plaintiff's tracts is possibly impaired—even if none of the contamination in the aquifer has actually reached the groundwater directly underneath Plaintiff's other tracts.

*Miller v. Cudahy Co.*, 567 F.Supp. 892 (D.Kan.1983), *aff'd in part and rev'd in part on other grounds*, 858 F.2d 1449 (10th Cir. 1988), is instructive on this point. *Miller* involved a salt mining operation's pollution of an underground aquifer. The defendant moved for summary judgment as to those plaintiffs whose property only partially covered the aquifer, and who could not demonstrate actual physical contamination of groundwater directly underneath their property. The court denied defendant's motion as to these plaintiffs, noting that defendant's argument was "specious as applied to those properties that overlie the aquifer even slightly. *Any* access to the aquifer would allow a well to be drilled, bringing the benefits of domestic and irrigation water to the whole tract. . . ." *Id.* at 897 (emphasis in original). According to the uncontradicted affidavit testimony of Plaintiff's expert, Robert W. Newcomer, were Plaintiff to drill any wells tapping the aquifer, the contaminant plume would be drawn to the new displacement of water and could thereby contaminate Plaintiff's water source directly. This inability to tap the underground aquifer is an interference of use and enjoyment of the land sufficient to support nuisance liability, regardless of whether the contaminant plume has actually invaded other tracts of Plaintiff's property.[2]

Hence, the apparent lack of evidence demonstrating actual invasion of contaminants is relevant only to Plaintiff's trespass claim. It appears, however, that Plaintiff's expert testimony provides the evidentiary support necessary to withstand summary judgment as to the trespass cause of action. In lieu of test-

---

**2.** Defendant contends Plaintiff lacks current water rights in the underground aquifer, and therefore Plaintiff's use and enjoyment of land is not impaired by groundwater contamination. This contention, besides being unsupported by the record, would not eliminate any present impairment with use and enjoyment of the property at

issue, even if true. Future acquisition of water rights and consequent drilling would be futile if the groundwater is contaminated. Should Plaintiff wish to sell the property, groundwater contamination would also discourage acquisition of extensive groundwater rights by prospective buyers, and thus reduce the value of the property.

ing or sampling results, Plaintiff relies on the opinions of three experts in the applicable field, testifying by affidavit. One such expert, Philip B. Bedient, opined, "It is highly likely that the contamination from ATSF's Albuquerque site has travelled a significant distance, given the extremely long period of time the treatment facility operated ... and the relatively high velocities of groundwater in the area." Bedient believes that the contaminant plume is "moving east to northeast," based on a missing layer of clay which acts as a "very permeable conduit for the migration of groundwater contamination." Finally, Bedient stated that, based on his experience at other sites, it is also "highly likely" that contamination has reached tract 10 and it is "more likely than not" that it has reached tracts 8 and 9.

Gary D. McGinnis, Plaintiff's other expert, testified, "It is also likely that significant horizontal migration of the oil phase contamination has occurred." McGinnis asserted that the water table underneath the ATSF site has "historically been within inches of the ground surface," and thus the creosote and other materials did not have far to drift before contaminating the groundwater. McGinnis pointed to soil samples taken pursuant to the Radian investigation and noted that the severity of the contamination increases with depth. Bedient testified that the deeper the groundwater, the faster it moves. Thus, horizontal migration appears likely. Based on McGinnis' experience at other similar tie-treatment sites with similar chemicals, horizontal migration can reach as much as a mile or more from the source areas. McGinnis believes the contaminant plume is moving to the south and east, as well as to the north and northeast. McGinnis also claims that "demonstrated migration of contamination to the west" exists.

Robert W. Newcomer, a geology and hydrogeology expert, emphasized that ATSF's investigation has revealed contamination of the groundwater directly underneath the site that has reached both of the top two aquifers (the shallow and intermediate aquifers). Groundwater flow from the early 1900s has been north to south (parallel to the Rio Grande River), but has in modern times shifted to an east/southeast direction, due to the effect of municipal pumping systems. "Thus, over the 64 years the ATSF wood treating facility operated, depth to groundwater and groundwater flow direction and rate have changed significantly, influencing both the rate and direction of movement of ATSF's hazardous contamination plume." Newcomer opined that drilling groundwater wells in the vicinity would influence and perhaps exacerbate contaminant flow. "Utilizing a water supply well within or near the contaminant plume could adversely affect and further complicate plume migration or contaminant transport ... by inducing and accelerating the migration of the contamination plume towards [new wells]."

Plaintiff's experts' testimony, however, does reveal a major deficiency of Plaintiff's case. Bedient noted that the extent of this supposed horizontal migration is impossible to determine "due to ATSF's limited and inadequate investigation." And McGinnis stated, "Additional sampling needs to be conducted both on and off the ATSF site to determine the extent of horizontal migration...." Newcomer also disparaged ATSF's investigation and lamented the uncertainty. All of these experts, therefore, have admitted that more exploration of the area needs to be conducted in order to determine more precisely the extent of horizontal migration. As Plaintiff bears the burden of proof in this case, Plaintiff is the party responsible for conducting this exploration; yet, Plaintiff apparently does not intend to do so.

▮ Nevertheless, summary judgment should not be granted, despite this deficiency. The experts' affidavits raise issues of credibility, and the rule is well-settled that the Court should not make credibility determinations on a motion for summary judgment. *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980). The only instance in which a court may grant summary judgment despite contrary affidavit testimony is when it is "too incredible to be accepted by reasonable minds." *Whitaker v. Coleman,* 115 F.2d 305, 306 (5th Cir.1940).

The experts' opinions do not fall into this category. A reasonable jury could find the experts' testimony credible, based in part on their prior experience with similarly situated hazardous waste sites. Plaintiff has shown genuine issues of material fact by virtue of the experts' testimony, coupled with the undisputed facts that (1) the contamination is not limited to the ATSF site; (2) the groundwater underneath tract 14 north is contaminated; (3) the site had been actively discharging waste for nearly 65 years; and (4) the groundwater moves relatively quickly in this area and has changed direction over the years. Defendant failed to contradict or impeach the experts' testimony and did not attack their qualifications or their analysis. Consequently, Defendant's motion for summary judgment as to counts II and III is denied.

## MOTION FOR SUMMARY JUDGMENT AS TO COUNTS VI AND VII[3]

■■■ Plaintiff alleges in count VI that Defendant's conduct violated applicable state environmental statutes, and that these violations constituted negligence *per se*. The doctrine of negligence *per se* dictates that applicable statutes constitute the governing standard of care, and violation of those statutes is negligence as a matter of law. Restatement (Second) of Torts § 286 (1977). Negligence as a matter of law exists when: (1) an applicable statute prescribes certain actions or defines a standard of conduct, either explicitly or implicitly; (2) the plaintiff is in the class of persons sought to be protected by the statute; (3) the plaintiff's alleged harm or injury is generally of the type the legislature sought to prevent by enactment of the statute; and (4) the defendant violated the statute (an issue for the jury). *Archibeque v. Homrich*, 88 N.M. 527, 532, 543 P.2d 820 (1975); Restatement (Second) of Torts § 286

(1977). Another factor used by the courts is whether the legislature intended to permit such private rights of action based on the statute in question. *See, e.g., Valdez v. Cillessen & Son, Inc.*, 105 N.M. 575, 734 P.2d 1258 (1987), discussed *infra.*

Plaintiff relies on three statutes in support of its negligence *per se* claim: the New Mexico Hazardous Waste Act, N.M.Stat.Ann. §§ 74–4–1 to –14 (Michie 1978), the New Mexico Water Quality Act, N.M.Stat.Ann. §§ 74–6–1 to –17, and the public nuisance statute at N.M.Stat.Ann. § 30–8–1 to –14.[4] Defendant objects to count VI on two grounds: one, the statutes Plaintiff relies on cover only active facilities, not closed sites no longer in operation; and two, any relevant permitting statutes have not been violated because neither the EPA nor the NMED has required ATSF to obtain a permit.

■■■ The latter contention is meritless. Since 1986, the ATSF site has been under extensive EPA and NMED scrutiny because the site is to be remediated. The focus of the efforts thus far has been removal of the waste. ATSF has no intention of continuing to use the site to store the existing waste. Instead, ATSF, with agency oversight, is attempting a cleanup. Logically, therefore, the agencies in question would not press ATSF to obtain a hazardous waste permit to store hazardous waste that is now in the process of being removed. Admittedly, no agency required ATSF to obtain a permit prior to 1986, but the fact that the Acts were not enforced does not necessarily prove that ATSF did not violate the Acts.

■■■ Defendant's first objection is also flawed. Defendant claims that the Hazardous Waste Act and the Water Quality Act, both requiring permits, apply only to sites currently or prospectively active. After 1972, the site ceased operations, and thus,

---

**3.** Count VII contains Plaintiff's strict liability claim, which will be addressed in an evidentiary hearing to the Court.

**4.** Plaintiff's attempt to rely on both the Hazardous Waste Act and the Water Quality Act in support of its negligence *per se* claim is erroneous. The Water Quality Act is a separate regulatory scheme and does not overlap the Hazardous Waste Act. "The Water Quality Act does not

apply to any activity or condition subject to the authority of the environmental improvement board pursuant to the Hazardous Waste Act...." N.M.Stat.Ann. § 74–6–12. Plaintiff must choose one or the other. Most likely, the Hazardous Waste Act is the appropriate statute in this case. However, the point is immaterial because, as discussed *infra*, neither statute forms the basis for a valid negligence *per se* claim.

Defendant argues, no permits would have been required at that time. Defendant, however, points to no statutory provision to that effect, and employs a crabbed definition of the term "active." The Hazardous Waste Act requires permits for sites in which hazardous waste is to be "stored or disposed." To "knowingly treat, store, or dispose of any hazardous waste ... without having obtained a hazardous waste permit...." N.M.Stat. Ann. § 74–4–11(A)(2)(a), results in criminal sanctions. *See id.* at §§ 74–4–11(B), 74–4–11(D). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking or *placing* of any solid waste or hazardous waste into or on any land or water so that such [waste] may enter the environment or be ... discharged into any waters, including ground waters...." N.M.S.A. § 74–4–3(C) (emphasis added). ATSF's placement of creosote into a wastewater pit clearly falls into the "disposal" category. Therefore, ATSF would have been required to obtain a permit, even after 1972 (and again, the fact that no agency actually mandated compliance with the permitting requirement does not necessarily indicate that Defendant did not violate the Act).

Plaintiff's negligence *per se* claim is objectionable, however, on other grounds. Assertion of a negligence cause of action predicated on an alleged violation of a statute is little more than an attempt to assert a private cause of action for damages by privately enforcing the statute in question. "A negligence *per se* claim alleging a violation of [a statute] is little different than an implied right of action under [the statute] for money damages." *Sanford Street Local Dev. v. Textron, Inc.,* 768 F.Supp. 1218, 1224 (W.D.Mich. 1991), *vacated pursuant to settlement,* 805 F.Supp. 29 (W.D.Mich.1991). Under both theories, the overriding criterion is legislative intent. "[N]ot every statutory violation gives support to a claim of negligence *per se.* Instead, a court must examine legislative in-

tent...." *Fallowfield Dev. Corp. v. Strunk,* Nos. 89–8644, 90–4431, 1991 WL 17793, at 8, 1991 U.S.Dist. LEXIS 1699, at *23–24 (E.D.Pa. Feb. 11, 1991). "The issue of whether a plaintiff can assert a cause of action based on negligence *per se* is closely related to the question of whether a private cause of action exists under a statute.... Both ... address the question of whether the policy behind the legislative enactment will be appropriately served by using it to impose and measure civil damage liability." *Lutz v. Chromatex,* 718 F.Supp. 413, 428 (M.D.Pa. 1989). In addition, Restatement (Second) of Torts § 288 (1977) expresses concern for legislative intent, and provides that a court should not adopt a statute as a standard of conduct when the legislature intended to protect the interests of the state, or when the legislature intended only "to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public...." *Id.* at § 288(b).[5]

Neither the New Mexico Hazardous Waste Act nor the Water Quality Act provides as a remedy private enforcement and recoverability of pecuniary loss. Under the Hazardous Waste Act, the New Mexico Secretary of the Environment may seek injunctive relief and has the power to assess civil penalties in the amount of $10,000 per day of noncompliance with permitting requirements. N.M.S.A. §§ 74–4–10, 74–4–12. All collected penalties are credited to the hazardous waste emergency fund, *id.* at § 74–4–10(J), which is similar to the federal Superfund—monies are used for remediation of hazardous waste sites throughout New Mexico. Section 74–4–11 sets forth various criminal penalties. No provision exists for private litigants to sue for compensatory damages. Concerned citizens may initiate complaints with the Department of the Environment, participate in public hearings related to issuance, denial, or modification of a permit, N.M.S.A. § 74–4–4.2(H), or comment on, or testify concerning,

---

5. The reporters explain clause (b) as follows: Other legislative enactments and regulations are intended only for the purpose of securing to individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individual from harm. Thus a stat-

ute may be intended only to secure the public right of unobstructed passage on the public highway, or freedom from excessive noise or immoral conduct in the community. Restatement (Second) of Torts § 288 cmt. b (1977).

the adoption or repeal of regulations, N.M.S.A. § 74–4–5. Additionally, any person adversely affected by any action of the Secretary of the Department of the Environment may obtain judicial review. N.M.S.A. § 74–4–14. But these are the only provisions concerned with private citizen participation.

The Water Quality Act is nearly identical. The Water Quality Control Commission, not private attorneys general, is charged with enforcement. *See* N.M.S.A. §§ 74–6–10, – 10.1. Criminal penalties are contained in section 74–6–10.2. The same level of citizen participation exists as well. N.M.S.A. §§ 74–6–5, 74–6–7.

No New Mexico cases have squarely addressed the issue of whether an implied private right of action exists under these statutes, or whether negligence *per se* may be predicated on their violation. However, the Supreme Court of New Mexico has recognized that a plaintiff asserting a negligence *per se* claim must show that the legislature intended to permit private enforcement and collection of damages, or at least, did not intend to disallow such private rights of action. In *Valdez v. Cillessen & Son, Inc.*, 105 N.M. 575, 734 P.2d 1258 (1987), the court rejected plaintiff's attempt to assert a negligence *per se* cause of action based on alleged violations of the federal and New Mexico Occupational Safety and Health Acts, 29 U.S.C. §§ 651–678 and N.M.Stat.Ann. §§ 50–9–1 to –25. The court recited the four section 286 Restatement factors, but did not apply them. *Valdez*, 105 N.M. at 577, 734 P.2d 1258. Instead, the court determined that "OSHA violations do not constitute a basis for assigning negligence as a matter of law" because of the lack of legislative intent to allow private civil actions for damages based on violations of OSHA standards. *Id.* at 577–78, 734 P.2d 1258, *citing Arvas v. Feather's Jewelers*, 92 N.M. 89, 91, 582 P.2d 1302 (Ct.App.1978) (reaching the same conclusion in dicta).

Other courts have disallowed negligence *per se* claims predicated on environmental statutes which are similar to New Mexico's. In *Lutz v. Chromatex*, 718 F.Supp. 413 (M.D.Pa.1989), the court held that neither the Pennsylvania Clean Streams Law ("CSL"), nor the Pennsylvania Solid Waste Management Act ("SWMA"), provides for a private cause of action for damages, and therefore plaintiff's negligence *per se* claims were barred. *Id.* at 426–27. Both statutes only provided for actions in abatement or allowed the state environmental agency to collect civil penalties, and hence "the court would be going against the expressed intentions of the legislature by permitting plaintiffs' negligence *per se* claims to proceed." *Id.* at 428. Where "legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. . . . I am not free to engraft an additional right of action upon statutory provisions which do not contemplate such a right." *Id.* at 427. *See also Fallowfield Dev. Corp. v. Strunk*, Nos. 89–8644, 90–4431, 1991 Wl 17793, at *8–10, 1991 U.S.Dist. LEXIS 1699, at *23–28 (E.D.Pa. Feb. 11, 1991) (reaching the same result as to the CSL and the SWMA, but relying on the exception in section 288 of the Restatement; "[t]he statute[s are] intended to protect the health, safety, and welfare of the community and not individuals seeking to recover pecuniary losses."); *Pottstown Indus. Complex v. P.T.I. Services, Inc.*, No. 91–5660, 1992 WL 50084, at *10–13, 1992 U.S.Dist. LEXIS 3256, at *31–41 (E.D.Pa. March 11, 1992) (concurring in analysis of *Fallowfield* and *Lutz* ). *But see Toole v. Gould, Inc.*, 764 F.Supp. 985, 993 (M.D.Pa.1991) (disagreeing with the majority of other Pennsylvania federal courts and permitting an implied private right of action based on language in statute allowing recovery of response costs incurred by "any other person," despite the fact that the legislature had expressly considered and rejected a private cause of action).

Plaintiffs attempted to use the Colorado Radiation Control Act and Water Quality Control Act as bases for imposition of compensatory damages in *National Wildlife Fed. v. Cotter Corp.*, 646 P.2d 393 (Col.Ct.App. 1981), *aff'd in part and rev'd in part on other grounds*, 665 P.2d 598 (Colo.1983), but were unsuccessful. "Neither statute contains a private enforcement mechanism. Both are for the protection of the general public through a clearly established regulatory

scheme under which the Health Department Divisions ... are given enforcement powers to handle violations." *Id.* at 395. In *Sanford Street Local Dev. v. Textron, Inc.,* 768 F.Supp. 1218 (W.D.Mich.1991), *vacated pursuant to settlement,* 805 F.Supp. 29 (W.D.Mich.1991), the plaintiff asserted that defendant's alleged violations of the federal Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601–2629, constituted negligence *per se,* and therefore plaintiff should be entitled to compensatory damages. *Textron,* 768 F.Supp. at 1223. The court noted, however, that the TSCA only provides for injunctive relief. *Id.* Because a negligence *per se* claim is "little different" than an implied private cause of action for damages, *id.* at 1224, the court refused to provide plaintiff recourse to remedies which Congress did not see fit to provide. "It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Id.* at 1223, *quoting Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

The New Mexico legislature constructed an extensive remedial regime in these Acts. To permit a private cause of action for damages, by allowing Plaintiff to allege negligence *per se* based on violations of the Acts, would be engrafting an additional remedy the legislature did not provide. "The presumption that a remedy was deliberately omitted from a statute is strongest when [the legislature] has enacted a comprehensive legislative scheme, including an integrated system for enforcement." *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1583–84, 67 L.Ed.2d 750 (1981). Moreover, the following provision was included in the Water Quality Act:

> The Water Quality Act provides additional and cumulative remedies to prevent, abate and control water pollution, and nothing abridges or alters rights of action or remedies in equity under the common law or statutory law, criminal or civil. *No provision of [the Act] estops ... any person as owner of water rights or otherwise, in the exercise of their rights in equity or under*

*the common law or statutory law to suppress nuisances or to abate pollution.*

N.M.S.A. § 74–6–13 (emphasis added). Similar clauses are contained in the Pennsylvania environmental laws, and as stated by the *Chromatex* court, "Thus, the legislature obviously had the rights of private citizens in mind when it drafted the Acts but elected to protect those rights by way of existing common law remedies, such as actions for negligence and nuisance." *Chromatex,* 718 F.Supp. at 428. And finally, the New Mexico legislature did provide for other forms of citizen participation, as discussed above. As was the case in *City of Middletown v. Hartford Elec. Light Co.,* 192 Conn. 591, 473 A.2d 787 (1984), "[t]he legislature may well have concluded that private interests were amply served, without private causes of action, by affording access to private persons to the regulatory process by way of complaints...." *Id.* 473 A.2d at 789 (ruling that Connecticut environmental law similar to New Mexico's contains no implied private remedies).

Insufficient evidence of legislative intent to supplement agency enforcement with private enforcement exists. For this reason alone, Plaintiff's negligence *per se* claims should be disallowed. "The ultimate question is one of [legislative] intent, not ... whether this Court thinks it can improve upon the statutory scheme that [the legislature] enacted into law." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979). However, assertion of a private cause of action would not only be contrary to legislative intent, but may actually frustrate that intent. All penalties collected by the Secretary of the Environment are used for future remediation efforts in other areas of the state. If plaintiffs were permitted to recover damages for their own individual losses before the Secretary could assess civil penalties, then potentially less money would be available for state-wide cleanup. In addition, the New Mexico Acts vest decisionmaking authority in one centralized agency. Allowing private rights of action may interfere with the uniform exercise of that authority.

[T]he effective role in defining substantive law, at least in the first instance, is left to

the administrative agency.... A private right of action by-passes the administrative structure in favor of direct resort to the courts.... [T]he courts have no specialized expertise; the enforcement agenda is decentralized among private plaintiffs; and the decisionmaking process is insulated from political pressure.... [J]udicial recognition of a private right of action may well be viewed as disruptive of the role assigned to the administrative agency in the enabling legislation.

Peter W. Low & John C. Jeffries, Jr., Federal Courts and the Law of Federal–State Relations 385 (2d ed. 1989). A Florida court recognized this notion in *Florida v. General Dev. Corp.*, 448 So.2d 1074 (Fla.Dist.Ct.App. 1984), *approved*, 469 So.2d 1381 (Fla.1985). The court prohibited a local state attorney to sue under a Florida environmental law because the statute only provided for enforcement by the state Department of Environmental Resources, and "[i]t only makes sense that a state-wide agency which is specifically chartered by the legislature as the state's chief pollution control agency ... has the sole authority to institute civil actions pursuant to [the Act]." *Id.* at 1082. *See also United States v. Hooker Chem. & Plastics*, 749 F.2d 968, 987–88 (2d Cir.1984) (ruling that no private right of intervention exists under the Clean Water Act; "Congress did not intend for private individuals to be able to use the federal courts to 'substitute a common law or court-developed definition of water quality' outside of the elaborate administrative process provided for by these acts." (citations omitted)).

■■■ Plaintiff's reliance on New Mexico's public nuisance statute is similarly misplaced. The section authorizing private actions is entitled *"Abatement* of a public nuisance," N.M.S.A. § 30–8–8 (emphasis added), and provides, "A civil action to abate a public nuisance may be brought, by verified complaint in the name of the state ... by any public officer or private citizen, ... against any person ... who shall create, perform or maintain a public nuisance." *Id.* at § 30–8–8(B). Obviously, the statute does not provide for recoverability of damages. Nonrecoverability of pecuniary loss is consistent with the statute's intent. The abatement suit is brought on behalf of, and in the name of, the state. *Id.* Complainants are acting for the citizenry in general, and seek to force those who maintain public nuisances to refrain from further injuring the people. Public nuisance actions "have as their major purpose the protection of rights held in common by the public." *Albuquerque v. State*, 111 N.M. 608, 611, 808 P.2d 58 (Ct.App.1991) (although not the subject of appeal, the district court had dismissed plaintiffs' individual claims for monetary damages arising from the City's alleged public nuisance). Section 288 of the Restatement, the exception to the negligence *per se* doctrine applicable where the statute is intended to secure rights of the public in general, applies here. *See supra* note 4 and accompanying text.

In conclusion, Plaintiff's negligence *per se* claims predicated on violations of the New Mexico Hazardous Waste Act, Water Quality Act, and public nuisance statutes are dismissed. None of the statutes in question authorize, either implicitly or explicitly, recoverability of pecuniary damages by private litigants, and indeed such actions appear contrary to legislative intent. Count VI fails as a matter of law.

Wherefore,

**IT IS ORDERED, ADJUDGED AND DECREED** that Defendants' motion for summary judgment as to Plaintiff's claims for injunctive relief be, and hereby is, granted in part. Plaintiff's injunctive relief claims in counts III and IV will be stayed pending final action by the EPA and/or the NMED.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment as to count VIII be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgment as to counts II and III be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment as to count VI be, and hereby is, granted.